**BUFFALO ARMS, Inc., Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Appellee.**

No. 255, Docket 23331.

United States Court of Appeals Second Circuit.

Argued April 7, 1955.

Decided June 3, 1955.

Kenefick, Bass, Letchworth, Baldy & Phillips, Buffalo, N. Y., for petitioner; Howard M. Holtzman, New York City, Francis V. Cole, Francis J. Offermann, Jr., and William A. Bain, Jr., Buffalo, N. Y., of counsel.

David P. Findling, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Frederick U. Reel, Atty., N. L. R. B., Washington, D. C., and Rosanna A. Blake, Atty., N. L. R. B., Silver Spring, Md., for respondent.

Arthur J. Goldberg, Gen. Counsel, Washington, D. C., Peter J. Crotty, Buffalo, N. Y., H. Howard Ostrin, Cooper, Ostrin & De Varco, New York City, Attys., for United Steelworkers of America, CIO, as amicus curiae.

Before L. HAND, SWAN and HINCKS, Circuit Judges.

SWAN, Circuit Judge.

This case is before us upon the petition of Buffalo Arms, Inc., to set aside an order of the National Labor Relations Board, and upon the Board's request for enforcement of the order. The order directs Buffalo to cease and desist from refusing to bargain collectively with United Steelworkers of America, CIO, and to take specified affirmative action, including (a) bargaining collectively with the .Steelworkers union upon request, and (b) offering reinstatement with back pay, upon application by them, to all employees who went on strike on June 14, 1954 or thereafter in protest against the company's refusal to bargain with the union. There is no dispute that Buffalo did refuse to bargain collectively with the Steelworkers union. The Company contends that its refusal was justified (1) because the consent election held on November 19, 1953, at which the Steelworkers union received a majority of the votes cast by employees in an appropriate unit of Buffalo's employees, was invalid, and (2) because the Regional Director by his Supplemental Report set aside the election, and the agreement under which the election was held made final and conclusive his determination of any question relating to the election.

The facts relative to the election must be stated in some detail. Section 9(c) of the National Labor Relations Act, 29 U.S. C.A. § 159(c), provides for two types of election. One is to be held after a hearing "conducted by an officer or employee of the regional office," 29 U.S.C.A. § 159 (c) (1); the other is after "the waiving of hearings by stipulation for the purpose of a consent election in conformity with regulations and rules of decision of the Board." 29 U.S.C.A. § 159(c) (4). The election of November 19, 1953 purported to be a consent election pursuant to an agreement therefor dated November 10, 1953 between Buffalo, the Steelworkers union and the International Association of Machinists, AFL, and approved by the Regional Director of the Board.[1] This agreement waived a hearing, provided for an election by secret ballot under the supervision of the Regional Director, defined the eligible voters, specified that the Regional Director shall prepare a Notice of Election and that the employer, upon the request of and at a time specified by the Regional Director, will post such Notices, and stated:

"* * * In the event more than one labor organization is signatory to this agreement, the choices on the ballot will appear in the wording indicated below and in the order enumerated below, reading from left to right on the ballot:

First.   Neither
Second.  United Steelworkers of America, CIO
Third.   District No. 76, International Association of Machinists, AFL."

The quoted provision as to choices to appear on the ballot was obviously applicable, since both the CIO union and the AFL union were signatories to the agreement. However, on November 12, 1953 the AFL union notified the Regional Director that it was withdrawing from the ballot. On the following day the Regional Director sent to Buffalo the Notice of Election to be posted by it. The notice made no mention of the AFL union and the sample ballot, which the notice incorporated, stated that the voters were to vote "Yes" or "No" on the question:

"Do you wish to be represented for purposes of collective bargaining by—

"United Steelworkers of America, C.I.O. ?"

Accompanying the notice received by Buffalo was a copy of the consent election agreement bearing a red-pencil notation that the AFL union had withdrawn from the ballot. Buffalo promptly posted the Notice of Election. On November 16, 1953 Buffalo received from the Regional

---

[1]. Sec. 102.54 of the Board's Rules and Regulations provides for a consent election pursuant to such an agreement.

Director a letter, dated November 13, giving formal notice of the withdrawal from the ballot of the AFL union. Buffalo's counsel immediately wrote the Regional Director that Buffalo, "reserving all its rights in the premises," protests and objects "to the making of this substantial change in the terms and conditions of the election as agreed upon, to the manner of effecting the change, and to the failure to give due and adequate notice thereof to the employer as one of the parties to the agreement." Upon receipt of this letter on November 17, the Regional Director telephoned Buffalo's counsel, but the parties are not in accord as to whether Buffalo was offered an opportunity to withdraw from the consent agreement. On November 18, Buffalo posted a notice urging the eligible voters to exercise their right to vote and reminding them that "a majority of the valid ballots cast will determine the result of the election." The election was held on November 19. There were 435 eligible voters; 403 ballots were cast, of which one was invalid; of the 402 valid ballots, 243 were for the union and 159 against it.

After the result of the election was known, Buffalo wrote the Regional Director reiterating the objections stated in its letter of November 16 and asserting in addition that the withdrawal of the AFL union voided the agreement of November 10th and consequently the election could not have been held legally without a new agreement. On December 2, 1953 the Regional Director issued his report overruling Buffalo's objections, and certified that the Steelworkers union is the exclusive representative of the employees in the unit for purposes of collective bargaining. Once again, by letter of December 7, Buffalo objected. The Regional Director considered this letter a request for reconsideration. He therefore reopened the case, reconsidered the matter and issued a Supplemental Report dated February 8, 1954, in which he with-

drew his Report of December 2, 1953, set aside the election, and recommended that the National Labor Relations Board revoke the certification of the CIO union included in that Report. The union filed exceptions to this Supplemental Report. On April 9, 1954 the Board, two members dissenting, sustained the union's exceptions and affirmed the Regional Director's report of December 2, 1953. By letter dated April 20 Buffalo excepted to the Board's order of April 9th, questioning the authority of the Board to issue the order. On June 8, 1954 the Board, the chairman dissenting, denied Buffalo's "request for reconsideration".

The complaint in the unfair labor practice proceeding was filed June 14, 1954. It charged that on December 14, 1953, and at all times thereafter Buffalo refused and still refuses to bargain collectively with the union.[2] The complaint also charged that on June 14, 1954 Buffalo's employees went on strike, and that the strike "was caused and prolonged" by Buffalo's refusal to bargain collectively with the union. A hearing was conducted on July 12, 1954 before a trial examiner who issued a report on September 23, 1954 in which he stated that the issues involved had been decided by the Board's order of April 9, 1954 and he did not deem himself authorized to alter or depart from such decision. Accordingly he found that the Steelworkers union had been since December 2, 1953 the certified exclusive bargaining representative of the employees in the specified unit; that Buffalo refused on December 14, 1953 to bargain with the union, and has continued such refusal in violation of section 8(a) (5) of the Act, 29 U.S.C.A. § 158(a) (5); and that the strike of June 14th was caused and prolonged by the employer's unlawful refusal to bargain. Buffalo filed exceptions to the report, which the Board overruled. It adopted the findings, conclusions and recommendations of the trial examiner and issued the order now before us for review.

2. The union's charge on which the complaint was based had been filed on December 17, 1953, on which date the Regional Director had before him Buffalo's motion to reconsider his Report of December 2, 1953.

We turn now to the Company's two contentions asserted as justification for its refusal to bargain. My brothers are of opinion that it is unnecessary to decide whether the withdrawal of the AFL union invalidated the election. What is said below on that subject expresses only my personal views. We are all agreed that the Regional Director's Supplemental Report setting aside the election was a final and conclusive determination which the Board should not have overruled.

The Board's Rules make no provision for the withdrawal of a party from a consent election agreement. In its order of April 9, 1954 affirming the Regional Director's Report of December 2, 1953 the Board held that Buffalo had ratified and consented to the withdrawal of the AFL union by posting the election notice and affirmatively encouraging the employees to vote in the election. I cannot agree that posting the notice was a consent to the truncated election. Buffalo would have exposed itself to the danger of being charged with an unfair labor practice for failure to participate in the election had it not posted the notice furnished by the Regional Director for that purpose. More can be said in favor of finding ratification and consent to the changed conditions in Buffalo's notice of November 18 urging the employees to vote. However, before this was posted, Buffalo had protested to the Regional Director, "reserving all its rights in the premises". The situation seems somewhat analogous to that where a defendant seasonably protests the jurisdiction of the court but proceeds to a determination of the merits, expressly reserving the jurisdictional question.[3] But however that may be, in my opinion the only valid way of waiving a hearing for the purpose of a consent election is "by stipulation". 29 U.S.C.A. § 159(c) (4). The very purpose of this provision must be to avoid disputes, which are likely to result in delay and possible litigation, as to whether conduct not evidenced by formal stipulation shall be deemed a waiver. If one party to a three-party stipulation for a consent election withdraws, I believe that a new agreement must be signed by the other two before a valid consent election can be held. This was the view taken by the Regional Director in his Supplemental Report of February 8, 1954. I think he was right. Buffalo might well have thought neither union would win if both appeared on the ballot. This had happened a year before in the September 17, 1952 election, and the run-off election of September 29th. With this recent election history in mind it may well be doubted whether the employer would have stipulated with the Steelworkers union alone for the consent election in November 1953. The Board's ruling treats the employer as if it had made a stipulation it never did make.

Furthermore, I think that the sample ballot must have created an atmosphere of confusion among the employees. While there is no evidence in the record on the subject, it can scarcely be doubted that the employees, or at least some of them, expected both unions to be candidates at the election, as they had been in the 1952 election; and the employees were given no intimation why the AFL union was omitted from the ballot. In Matter of General Shoe Corporation, 77 N.L.R.B. 124, 127 the Board stated:

> "In election proceedings, it is the Board's function to provide a laboratory in which an experiment may be conducted, under conditions as nearly ideal as possible, to determine the uninhibited desires of the employees. It is our duty to establish those conditions; it is also our duty to determine whether they have been fulfilled."

This was approved in Kearney & Trecker Corp. v. N.L.R.B., 7 Cir., 210 F.2d 852, 858. I do not think ideal "laboratory"

---

3. Finsilver, Still & Moss, Inc., v. Goldberg Maas & Co., Inc., 253 N.Y. 382, 391, 171 N.E. 579, 69 A.L.R. 809; Hassler, Inc., v. Shaw, 271 U.S. 195, 200, 46 S.Ct. 479, 70 L.Ed. 900.

conditions were established for the November 19th election.

We pass now to Buffalo's second contention, namely, that the Board lacked authority to reverse the Regional Director's determination in his Supplemental Report of February 8, 1954 to set aside the election. The consent agreement of November 10th provided in part as follows:

"* * * Said election shall be held in accordance with the National Labor Relations Act, the Board's Rules and Regulations, and the customary procedures and policies of the Board, *provided that the determination of the Regional Director shall be final and binding upon any question,* including questions as to the eligibility of voters, raised by any party hereto *relating in any manner to the election * * *.*" (Italics added.)

The Rules and Regulations of the Board also recognize the finality of the Regional Director's determinations.[4] Both the Board and the courts have recognized that the determination of the Regional Director should ordinarily be accepted as final. In Semi-Steel Casting Co. v. N.L.R.B., 8 Cir., 160 F.2d 388, 391, the court said:

"On review the Board accepts the Regional Director's decision on all questions pertaining to the election, unless shown to be arbitrary or capricious or not in conformity with the policies of the Board and the requirements of the Act."

In the case at bar the Board held that the final decision of the Regional Director was "without basis". It did not hold that his decision was arbitrary. There was no ground for so holding, in our opinion.[5] Nor do we think the Board rightly could have held that his decision was in conflict "with the policies of the Board and the requirements of the Act." The Regional Director was confronted with a close question, for the solution of which there was no clear statutory or decisional guide. He thought it fairer to set aside the election and begin anew. Had the Steelworkers union accepted his decision as final, in accordance with its agreement, unquestionably a valid election—with or without the employer's consent—could have been held with very little delay. The union still contends that the consent agreement was binding on Buffalo, despite the withdrawal of the AFL union, but by the same token it was binding on the Steel Workers union, and it was precluded from a review of the Regional Director's decision. The Board gave no effect to the agreement of finality and entertained a review on the merits. Even if the Board was right on the merits, as my brothers seem to think, we hold that it erred in failing to give recognition to the contract provision which made the Regional Director the final arbiter of questions relating to the election. Such a provision is highly salutary and should be favored. It tends to avoid controversies and delay in representation proceedings. To give it no effect, as did the Board, will strongly tend to remove all incentive to stipulate for consent elections. We conclude therefore that the action of the Regional Director in setting aside the election should have been sus-

4. Section 102–54(a) provides in pertinent part:
   "The method of conducting such election shall be consistent with the method followed by the regional director in conducting elections pursuant to sections 102.61 and 102.62 except that the rulings and determinations by the regional director of the results thereof shall be final, * * *."

5. See Semi-Steel Casting Co. v. N. L. R. B., 8 Cir., 160 F.2d 388, certiorari denied 322 U.S. 758, 68 S.Ct. 57, 92 L. Ed. 344; N. L. R. B. v. Capitol Greyhound Lines, 6 Cir., 140 F.2d 754, 758, certiorari denied 332 U.S. 763, 64 S.Ct. 1285, 88 L.Ed. 1590; N. L. R. B. v. General Armature & Mfg. Co., 3 Cir., 192 F.2d 316, 317, certiorari denied 343 U.S. 957, 72 S.Ct. 1052, 96 L.Ed. 1357; N. L. R. B. v. Carlton Wood Products Co., 9 Cir., 201 F.2d 863; 866, 36 A.L.R.2d 1170; N. L. R. B. v. Voltney Felt Mills, Inc., 6 Cir., 210 F.2d 559.

tained with the result that the unfair labor practice complained of was not proved.

The petition to set aside the order is granted.